UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FOUR SEASONS SOFTWARE, LLC,<br>    Plaintiff,<br><br>v.<br><br>ICICI INFOTECH, INC.,<br>    Defendant. | CIVIL ACTION NO.<br>3:05cv171 (SRU) |

## RULING ON CROSS-MOTIONS TO CONFIRM OR VACATE ARBITRATION AWARD

This case involves, in essence, a breach of contract dispute. I stayed the case in May 2005, while the parties arbitrated their claims. In July 2006, an arbitration panel ("the panel") issued a decision assigning liability to ICICI Infotech, Inc. ("ICICI") and awarding Four Seasons Software, LLC ("FSS") $2,040,000 damages. Subsequently, the parties filed cross-motions asking me either to confirm or vacate the award of damages. ICICI does not challenge the panel's decision with respect to liability, and does not oppose my confirming a damages award of $235,000 in favor of FSS. *See* Defendant's Memorandum at 2 n.1.

The narrow issue before me, therefore, is whether to confirm or vacate the panel's award of $1,805,000, which reflects the panel's award of damages in an amount equal to its valuation of FSS as of December 31, 2004. ICICI complains that this aspect of the award constituted a "manifest disregard of the law," and that I should therefore vacate that award. For the reasons discussed below, I disagree.

**I.     Background**

FSS was a Connecticut-based startup company founded in 2002 to develop a software program ("4S software") that would facilitate online and mail-order shopping. ICICI is the subsidiary of a major software development company and is headquartered in India. On

November 19, 2002, FSS and ICICI entered into a Master Service Agreement and a Statement of Work that, in essence, reflected a development partnership between the two entities.  In exchange for its work developing the 4S software product, ICICI was to receive a cash payment of $450,000, and certain royalties, intellectual property rights, and an equity stake in FSS.  The agreements also provided that Connecticut law would govern any dispute between the parties.

In March 2004, the two parties amended the agreement.  The amendment provided in relevant part that FSS would pay ICICI $600,000 rather than $450,000, and ICICI would release the source code to FSS once FSS had paid $450,000.  Subsequently, the parties began to disagree about project delays and expenses.  Ultimately, the parties could not work out their differences, and they stopped working together.  FSS demanded that ICICI turn over the source code of the 4S software.  ICICI refused.

FSS filed a replevin action in Connecticut state court to recover the source code, and in January 2005, ICICI removed the case to this court.  In May 2005, I stayed the case while the parties arbitrated the dispute.  On July 14, 2006, the panel issued an arbitration award finding that ICICI had breached its agreement with FSS subsequent to the March 2004 amendment.  The agreement limited damages to the amount FSS paid ICICI, $235,000, unless ICICI committed "willful misconduct."  The panel concluded that ICICI committed willful misconduct, and as a result, awarded FSS an additional $1.805 million.  The panel's amended award grants FSS a total of $2,040,000.  *See* Plaintiff's Exhibits D and E.

**II.    Discussion**

ICICI has not shown that the panel manifestly disregarded the law.  The panel did not ignore or refuse to apply the controlling legal principle established in *Beverly Hills Concepts,*

*Inc. v. Schatz and Schatz, Ribicoff and Kotkin*, 247 Conn. 48, 67-70 (1998), that an award of damages for the destruction of an unestablished enterprise may be based upon lost profits, provided the plaintiff presents "sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty."

A.  Standard of Review

1.  *"Manifest Disregard of Law" Overview*

Judicial review of arbitration awards is "extremely limited." *See, e.g.*, *Bear, Stearns & Co. v. Ontario*, 409 F.3d 87 (2d Cir. 2005); *Wallace v. Buttar*, 378 F.3d 182 (2d Cir. 2004); *Duferco International Steel Trading v. Klaveness*, 333 F.3d 383 (2d Cir. 2003). There are four statutory grounds for vacating an arbitration award, which principally address fraud or corruption of the arbitrators; the statutory grounds do not apply here.[1] In addition, there is a judicially-created basis for vacating an arbitration award when the award "exhibits a manifest disregard of law." *See, e.g., Duferco*, 333 F.3d at 388 (citing *Wilko v. Swan*, 346 U.S. 427 (1953)).

The party seeking to vacate the arbitration award bears the burden of proving manifest disregard of law. *Wallace*, 378 F.3d at 189. ICICI complains that the panel's decision awarding FSS damages reflecting the value of FSS constitutes a manifest disregard of law. ICICI "bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Id.* (citing *Duferco*, 333 F.3d at 388).

---

[1] *See Duferco*, 333 F.3d at 388 n.1 (citing 9 U.S.C. § 10(a)) (allowing vacatur of arbitration awards where (1) the award was procured by fraud; (2) there was evidence of corruption of the arbitrators; (3) the arbitrators were guilty of misconduct; or (4) the arbitrators exceeded their powers).

The reach of the manifest disregard of law doctrine is "severely limited." *Id.  See also Bear, Stearns*, 409 F.3d at 90.  "[O]btaining judicial relief for arbitrators' manifest disregard of the law is rare." *Duferco*, 333 F.3d at 389.  A review of the case law confirms that conclusion.  In *Duferco*, the Second Circuit calculated that, between 1960 and 2003, that Court applied the "manifest disregard of law" standard 48 times, and only vacated an arbitral award four times. *Id.*  Of those four vacaturs, three were arguably based on statutory grounds rather than the "manifest disregard of law" doctrine.  *Id.*  Following the one case, *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998), in which the Court expressly vacated the arbitral award based on "manifest disregard of law," the Court subsequently cautioned the district courts not to read *Halligan* too broadly, because it was a limited decision reflecting unique policy concerns.  *See Wallace*, 378 F.3d at 192 (responding to district courts' reliance on *Halligan* in vacating arbitration awards); *GMS Group, LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir. 2003).

The "manifest disregard of law" doctrine is a "doctrine of last resort – its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply."  *Wallace*, 378 F.3d at 189 (quoting *Duferco*, 333 F.3d at 389).  Courts must give great deference to arbitrators, because interfering with the arbitration process would "frustrate the intent of the parties," and would undermine the usefulness and finality of arbitration.  *See Duferco*, 333 F.3d at 389.  The Second Circuit has "often explained that 'arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'"  *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997) (citing *Willemijn v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.

1997)).

### 2. *"Manifest Disregard of Law Test" and How to Apply It*

To demonstrate that the panel manifestly disregarded the law, ICICI must prove that: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable. *Wallace*, 378 F.3d at 189; *Halligan*, 148 F.3d at 202.[2] A court may not vacate an arbitration award because it thinks the arbitrators made the wrong decision. *Wallace*, 378 F.3d at 190. Indeed, even if the court thinks that the arbitrator reached the wrong result or applied the law incorrectly, the court should nevertheless confirm the award, "despite [the] court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *Id.* (emphasis in original). That is true even if confirmation of the arbitrators' reasoning "would be based on an error of fact or law." *GMS Group*, 326 F.3d at 78. The manifest disregard of law doctrine justifies vacating an arbitration award only in the "most egregious instances of misapplication of legal principles." *Wallace*, 182 F.3d at 189.

The Second Circuit has recognized that, although the manifest disregard of law test is well established, application of the test is unclear. *See Duferco*, 333 F.3d at 389 ("Perhaps we so infrequently find manifest disregard, its precise boundaries are ill defined, although its rough contours are well known."); *GMS Group*, 326 F.3d at 77 ("Over time we have stated many, varied formulations of the manifest disregard standard in an attempt to give it better definition.").

---

[2] Sometimes the test is formulated as a three-prong test: (1) the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators; (2) the law was in fact improperly applied, leading to an erroneous outcome; and (3) the arbitrators actually knew about the law and its applicability to the issues before them. *Duferco*, 333 F.3d at 389-90.

The problem arises how to distinguish between intentional ignorance or refusal to apply controlling law and unintentional misinterpretation or misapplication of the law to the facts. There is usually no direct evidence whether an arbitration panel knowingly ignored or refused to apply controlling law. Arbitrators are not required to explain their decisions. *Bear, Stearns*, 409 F.3d at 91. Thus, "the reviewing court must attempt to infer from the record whether the arbitrators appreciated and ignored a clearly governing legal principle." *Id.*

A reviewing court's authority to review the record is limited. That is because "the Second Circuit does not recognize manifest disregard of the *evidence* as proper ground for vacating an arbitrator's award." *Wallace*, 378 F.3d at 193 (quotation omitted) (emphasis supplied). Rather, the Second Circuit recognizes the doctrine of manifest disregard of the *law*, which requires courts to confirm arbitration awards "in all but those instances where there is no colorable justification for a conclusion." *Id.* Therefore, a reviewing court may consider the evidentiary record only insofar as it bears upon the question whether there was a colorable justification for the panel's conclusion; a reviewing court may not "conduct a reasoned assessment of the evidentiary record." *Id.*

      B.     <u>Whether the Panel's Decision Constituted Manifest Disregard of Law</u>

Application of the "manifest disregard of law" standard requires me to make, in essence, three inquiries that I address in the following order: (1) whether the legal principle allegedly ignored by the arbitrators was well-defined, explicit, and clearly applicable; (2) whether the arbitrators knew of the governing legal principle; and (3) whether, knowing that principle, the arbitrators refused to apply it or ignored it. *Wallace*, 378 F.3d at 189; *Halligan*, 148 F.3d at 202.

1.	*Whether the Governing Legal Principle Was Clearly Established*

The parties do not dispute that the law was well-defined, explicit, and clearly applicable. The relevant legal principle governs the calculation of damages for destruction of a nascent, or undeveloped, business. In *Beverly Hills*, the Connecticut Supreme Court held that undeveloped businesses may be awarded damages to compensate them for the destruction of the business. The Court also held that one way to calculate damages for destruction of an undeveloped enterprise is to estimate the present value of a stream of expected future profits. *Beverly Hills*, 247 Conn. at 63. A trier of fact may only award such damages, however, if the plaintiff presents "sufficiently accurate and complete evidence for the trier of fact to be able to estimate those [damages] with *reasonable certainty*." 247 Conn. at 68-70 (emphasis supplied). Damages do not need to be proven "with mathematic certainty" or with "exactitude," but "the plaintiff cannot recover for 'the mere possibility' of making a profit." *Id.* at 69-70 (citation omitted). "The determination of damages involves a question of fact . . . ." *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 690 (1997).

The *Beverly Hills* court delineated several factors for the trier of fact to apply to calculate whether damages for lost profits have been proven with reasonable certainty: (1) the plaintiff's prior experience in the same business; (2) the plaintiff's experience in the same enterprise subsequent to the interference; (3) the experience of the plaintiff in a similar business; (4) the average experience of participants in the same line of business as the injured party; and (5) pre-litigation projections of profits, especially when prepared by the defendant. *Id.* at 73-74. The overarching concern, no matter what type of evidence is submitted, is that there be a "substantial similarity between the facts forming the basis of the profit projections and the business

opportunity that was destroyed." *Id.* at 74.  *See also Cheryl Terry Enterprises, Ltd. v. City of Hartford*, 270 Conn. 619, 640 (2004).

The *Beverly Hills* decision does not require the trier of fact to apply a particular methodology in calculating damages for future lost profits.  *See Beverly Hills*, 247 Conn. at 68-70.  What is required is that the plaintiff present enough evidence of sufficiently reliable accuracy from which the trier of fact can estimate future lost profits with reasonable certainty.  Although the legal principle that the trier of fact calculate future lost profits to a reasonable certainty is well-defined, that principle does not necessarily compel a particular conclusion.  Rather, the principle necessarily calls for the use of discretion in applying the guiding principle to the evidence, as illustrated by the fact that the Connecticut Supreme Court urged triers of fact to consider numerous factors in reaching a decision.

2. *Whether the Panel Knew of the* Beverly Hills *Principle*

It is undisputed that counsel made the panel aware of the governing legal principle.

In this case, both sides communicated the relevant legal principle to the panel by citing to the *Beverly Hills* decision and quoting the relevant language.  *See* Defendant's Exhibit B at 49 (citing *Beverly Hills* for the proposition that damages for lost profits must be proven to a "reasonable certainty"); Defendant's Exhibit C at 32 (delineating factors to be considered and stressing that the estimate must be reasonable, but not using the words "reasonable certainty"); Defendant's Exhibit E at 7 (arguing that, pursuant to *Beverly Hills*, FSS had met its burden of proving damages with "reasonable certainty").

"[A] court reviewing an arbitral award cannot presume that the arbitrator is capable of understanding and applying legal principles with the sophistication of a highly skilled attorney."

*Wallace*, 378 F.3d at 190.  Rather, the court must assume the arbitrator to be a "blank slate unless educated in the law by the parties."  *Id.* (quotation omitted).  A fair reading of the relevant cases suggests that, if the lawyers communicate the governing legal principle orally or in writing to the panel, the reviewing court can infer that the arbitrators had knowledge of that principle.  *See DiRussa*, 121 F.3d at 823.

        3.    *Whether the Panel "Ignored" or "Refused to Apply" the* Beverly Hills *Principle*

This is not a case where "some egregious impropriety on the part of the arbitrators is apparent."  *See Wallace*, 378 F.3d at 189 (describing the limited reach of the manifest disregard of law doctrine).  Rather, the panel's decision reflects that it conducted a reasoned, careful analysis, and attempted to apply the governing legal standard to the evidence to calculate the damages award.  The panel provided much more than "a barely colorable justification" for its damages award, because the panel considered some of the *Beverly Hills* factors and applied those factors to the evidence.  A panel's failure to understand the law or to apply it appropriately is not enough to vacate the panel's decision; there must be more, in essence, the intent to reach a particular result irrespective of what the law requires.  *See GMS Group*, 326 F.3d at 77.  At most, ICICI has proven that the panel misinterpreted or misunderstood the *Beverly Hills* standard; that is not manifest disregard of law.  *See Wallace*, 378 F.3d at 189-90; *Duferco*, 333 F.3d at 389 (citing *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002)).

        a.    The Panel's Decision Regarding Damages

The panel explained how it arrived at its damages award over about seven pages in a 28-page written decision.  *See* Plaintiff's Exhibit D at 20-27.  The panel recognized the crucial issue,

how to value FSS's business prospects, in light of the fact that the panel found that ICICI had extinguished those prospects. *Id.* at 21. The panel certainly recognized that valuing future business prospects, particularly for a start-up business, is a difficult endeavor. *Id.* at 21. The panel did not, however, indicate that it could not reasonably estimate FSS's value; the panel's process of culling and weighing the evidence, as reflected in its written decision, demonstrates it could.

The panel's "starting point" was ICICI's pre-litigation valuation of FSS. *Id.* at 22-24; *cf. Beverly Hills*, 247 Conn. at 74 (delineating this factor as a proper consideration in calculating damages). Prior to litigation, ICICI and its experts had valued its eight percent share in FSS at $480,000, which results in a value of $6 million for the entire company. ICICI adopted that value on its books for use in making a public offering in 2005. The panel noted that ICICI's valuation was "similar" to the $5.8 million valuation calculated by plaintiff's expert, Dr. Stephenson. Plaintiff's Exhibit D at 22 (citing 3i Ex. 546). The panel did not simply adopt Dr. Stephenson's valuation, however, because his valuation was "fundamentally based on FSS sales and operating assumptions which the panel finds are questionable." *Id.*

The panel noted that it was "unable to credit fully the testimony of any of the financial experts presented." *Id.* The experts provided information "helpful" to the panel, but "none of the experts . . . considered the evidence assuming an actual introduction of the Beta in 2005 with the marketing release to follow in 2006." *Id.* Because no expert employed the assumptions the panel found appropriate, the panel did not accept the valuation proposed by either expert. Instead, based on various factors, including market structure, product pricing, competitive advantages and disadvantages of the 4S software, difficulty of market entry, and the need for an

attractive legacy import system, the panel concluded that the valuation of $859,140 prepared by defendant's expert, Spadea, was "more appropriate" than Stephenson's. *Id.* at 24.

Still, the panel did not end its analysis by accepting the value for FSS proposed by defendant's expert. Rather, the panel applied its own discount rate, in place of the 80% figure used by defendant's expert. *See* Defendant's Exhibit F (3i Ex. 547). In doing so, the panel took account of other evidence in the record. For example, the panel noted that FSS was a "thinly capitalized business" in a market that was difficult to penetrate and that was dominated by another entity. The panel also considered FSS's delay in entering the marketplace and loss of initial sales for which ICICI had no liability. Plaintiff's Exhibit D at 22.

The panel also considered evidence of FSS's strengths. The panel noted the relatively successful experiences of other participants in the same line of business as FSS. *Id.* at 23; *see also Beverly Hills*, 247 Conn. at 73-74 (delineating this as another appropriate factor). Furthermore, the panel determined that ICICI had an equity investment in FSS and that ICICI viewed the 4S software product favorably. *Id.* at 21-22. The panel also considered the viability of the product and the fact that FSS was able to secure investors. *Id.* at 21. The panel recognized that "FSS had value," and considered that FSS had a "capable management team" in place. *Id.* FSS offered a product for which there was a demonstrated need. *Id.*

In sum, the panel considered ICICI's valuation of FSS and the valuations prepared by both experts. The panel did not accept any of those valuations wholesale; it considered the record evidence, including evidence concerning factors that *Beverly Hills* approved when calculating damages. There is nothing to suggest that this careful, balanced approach was tainted by the panel's adoption of assumptions it criticized as questionable.

      b.  Whether There is a "Barely Colorable Justification" For the Panel's Decision

ICICI argues that, because the panel indicated in its written decision that some of the assumptions on which Stephenson's valuation was premised were "questionable," the panel's entire methodology was tainted and reflected the panel's manifest disregard of the law.

I do not agree. The panel's decision demonstrates that the panel culled the evidence, using what it found helpful and accurate and rejecting what it found questionable or inaccurate, when calculating its damages award. When the panel found some of the experts' assumptions to be questionable, the panel rejected those assumptions. The panel's discussion of its damages calculation refutes, in several ways, the argument that it manifestly disregarded the law.

First, the panel did not adopt Stephenson's analysis when arriving at a value for FSS. Because it found certain of Stephenson's assumptions to be questionable, and based on its evaluation of the evidence concerning FSS's business prospects, the panel found the analysis prepared by defendant's expert, Spadea, "more appropriate." Some of Spadea's conclusions were derivative of Stephenson's, that is, Spadea's analysis responded to Stephenson's, and thus implicitly used his assumptions. That fact does not taint the panel's analysis, however, because the panel then adjusted even Spadea's valuation based on other evidence in the record.

Second, when calculating damages, the panel considered a broad range of evidence, including evidence relevant to the application of the *Beverly Hills* factors. In *Beverly Hills*, it is not clear whether the trial court considered any evidence other than the expert's valuation.[3] In

---

[3] It appears that the trial court in the *Beverly Hills* case accepted the expert's opinion without adjusting it based on the other evidence in the record, even though the assumptions on which the opinion was based were questionable. In addition, most of the other evidence in the record weighed against the imposition of lost profits damages. *See Beverly Hills*, 247 Conn. at

contrast, here, the panel both adjusted one of the expert valuations based on evidence concerning the difficulties FSS would need to overcome to earn profits, and also cited evidence supporting its finding that FSS would have earned profits.

Third, the *Beverly Hills* standard is whether there is "sufficiently accurate and complete evidence" from which the panel can estimate damages "with reasonable certainty." *Beverly Hills*, 247 Conn. at 70. That standard does not require the panel to disregard an expert's projection if there are aspects of the projection that the panel does not fully adopt. Here, no expert employed some of the assumptions the panel found appropriate, namely the panel's determination of the likely timing of product releases. Plaintiff's Exhibit D at 22.

The *Beverly Hills* standard necessarily involves discretion, and depends, in large part, on the weight of the evidence. ICICI is arguing, in effect, that the panel did not understand the nuances of the governing law, or simply applied the law to the evidence incorrectly. Manifest disregard of law involves "more than a simple error in law or a failure by the arbitrators to understand or apply it; and, it is more than an erroneous interpretation of the law." *Duferco*, 333 F.3d at 389 (citing *Westerbeke*, 304 F.3d at 208); *see also Wallace*, 378 F.3d at 189. Here, there was more than enough evidence for the panel to reach a sufficiently accurate and complete estimate of FSS's value with reasonable certainty, and the panel did so. Accordingly, there is certainly a colorable justification for the panel's decision.[4]

---

60-61.

[4] To the extent that ICICI suggests that the panel manifestly disregarded the law because it did not cite the *Beverly Hills* decision or use the buzz words "reasonable certainty" in its written decision, that suggestion has no merit. Arbitrators are not required to cite the reasons for their decisions, and a lack of an explanation does not mean that the arbitrator ignored the law. *Wallace*, 378 F.3d at 190. Here, the panel's explanation of its decision, even without citing

In addition, ICICI cites *Halligan*, 148 F.3d at 197, to support its argument that this case fits into the narrow set of circumstances in which the Second Circuit has determined that the manifest disregard of law doctrine applies. *Halligan* was one of the only cases since 1960 in which the Second Circuit reversed the District Court's confirmation of an arbitration award, and vacated the arbitration award based solely on the manifest disregard of law doctrine. In *Halligan*, an employee brought a claim under the Age Discrimination in Employment Act ("ADEA"), complaining that he had been terminated because of his age. The parties arbitrated the claim, and the arbitrator determined that there was no age discrimination. The arbitrator issued a written opinion, which did not explain the arbitrator's reasoning. The District Court confirmed the arbitrator's decision, because the record revealed conflicting evidence, the weighing of which seemed to depend on the arbitrator's credibility determinations.

The Second Circuit held that, in light of the overwhelming evidence of age discrimination, the arbitrator must have disregarded "the law or the evidence or both." *Halligan*, 148 F.3d at 204. The Court analyzed the evidence in great detail to conclude, in effect, that the only conclusion the arbitrator could have drawn based on the evidence was the employee had been terminated based on his age. ICICI analogizes that holding to this case, arguing that, in this case, the evidence was so overwhelming that the only conclusion the panel could have drawn was that FSS's profits could not be estimated with reasonable certainty.

*Halligan* was a unique case. The Court addressed two policy concerns in that decision. First, the Court expressed concern about whether an employee could effectively vindicate his

---

*Beverly Hills*, is instructive, because it illustrates the panel's process of applying the *Beverly Hills* principle.

federal statutory rights under the ADEA in the "arbitral forum." *Halligan*, 148 F.3d at 204. Second, the Court noted that the NASD had been criticized for the role it played in selecting arbitrators; thus, the Court seemed concerned about the impartiality of the arbitrators, particularly in the employment context where mandatory arbitration agreements were a source of controversy. *Id.*

Subsequent Second Circuit decisions have cautioned the district courts not to rely too heavily on *Halligan*. *See, e.g., Wallace*, 378 F.3d at 192 ("Our later cases, however, have cautioned against an over-broad reading of *Halligan*."); *GMS Group*, 326 F.3d at 78-79 (noting the unique policy concerns in employment discrimination claims). In fact, *Wallace* cited seven district court decisions issued after *Halligan* that explicitly relied on *Halligan* to vacate arbitration awards for manifest disregard of law. In response to those seven district court decisions, the *Wallace* Court clarified that "[s]uch reliance is mistaken." *Wallace*, 378 F.3d at 192. In *GMS Group*, the Court explained that *Halligan* addressed "unique concerns at issue with employment discrimination claims." *GMS Group*, 326 F.3d at 79.

The policy concerns in *Halligan* are not present in this case, nor does this case involve interpretation of a federal statute. The unique analysis in *Halligan* does not apply to this case as ICICI argues, nor does *Halligan* broaden the scope of my review of the panel's decision. I must determine if there is a barely colorable justification for the panel's decision, not re-weigh the evidence. *See Wallace*, 378 F.3d at 193. As discussed above, I conclude that there is more than a barely colorable justification for the panel's decision, and thus, the panel did not manifestly disregard the law.

**III.    Conclusion**

FSS's motion to confirm (**doc. #20**) is **GRANTED**.  I confirm the panel's award to FSS in the full amount of $2,040,000, plus interest at the rate of 10% from August 13, 2006 "until the award is paid in full."  *See* Plaintiff's Exhibit E at ¶ 2.  ICICI's motion to vacate (**doc. #24**) is **DENIED**.  FSS's motions for judgment (**docs. # 15 and 19**) are **DENIED AS MOOT**.  The clerk shall enter judgment and close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 22nd day of December 2006.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge